[L. A. No. 19669.   In Bank.   July 30, 1946.]

LOIS PRESTON, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Philbrick McCoy for Petitioner.

Jerold E. Weil and Stanley N. Barnes for Respondent.

THE COURT.—Petitioner seeks review of the action of the Board of Governors of The State Bar declining to recommend her readmission to practice law in this state. (Original Proceedings in Reviewing Courts, rule 59(b).) She was admitted to practice law in California on October 1, 1932. On February 14, 1933, she married Irving M. Gilbert, an attorney who had been practicing law for about 13 years. She was disbarred on June 23, 1938, following her conviction on four counts of recording a false instrument, and

conspiracy to commit grand theft and to violate sections 476a, 115, 531 and 182(4) of the Penal Code. Gilbert was found guilty of the same offenses. It was ordered that the sentences against petitioner run concurrently. After affirmance of the judgment on appeal (*People* v. *Gilbert*, 26 Cal.App.2d 1 [78 P.2d 770]), petitioner was imprisoned at Techachapi until her parole in September, 1941. She obtained a divorce from Gilbert in 1938, and in 1943 changed her name by court action to Lois Preston. On December 28, 1942, on the unanimous recommendation of the Advisory Pardon Board, petitioner received a full and unconditional pardon. This board reported to the governor that "A recent report from the State Parole Officer reveals that this applicant's behavior has been entirely satisfactory; that she has been working very hard and has kept her parole in every way."

On March 16, 1943, petitioner filed a petition for reinstatement with The State Bar. On the basis of the report of the special committee appointed by the Board of Governors that since only 18 months had elapsed since her release on parole, the petition "comes too soon after petitioner's release from prison" to justify a finding of rehabilitation, the Board of Governors refused to recommend her reinstatement. Petitioner did not seek review of this determination.

In August 1945 she again petitioned for reinstatement, and this petition also was referred to a special committee. The record before this committee reveals that after her parole, petitioner cared for her elderly father, and during her son-in-law's service in the armed forces, also supported her daughter and two grandchildren. From September 1941 to September 1942 she was employed part time as a clerk in the law offices of Hugh E. Macbeth in Los Angeles. Mr. Macbeth testified that he was closely acquainted with petitioner's activities since her disbarment, and went into considerable detail with respect to his observations as to her honesty and moral character. He testified that petitioner had a "very fast" legal mind and "was a prodigious worker." Her compensation from this employment was $12.50 a week. During the same period she did part time work as a waitress, earning about $10 a week. From April 1942 to September 1942 she also did part time work for an insurance company, for which she received about $10 a week.

From September 1942 to June 1943 she was employed at $160 a month by Western Truck Lines, Limited, and contin-

ued part time employment with Mr. Macbeth. C. J. Norona, who was petitioner's immediate employer, testified that petitioner informed him of her past difficulties after she had been employed for a month trial period, and that he gave her permanent employment despite this information; that petitioner started as a billing clerk and was later promoted; that part of her employment was as cashier and involved handling about $100 per day six days a week; that she was a "careful and efficient worker," and was found to be "thoroughly honest." "In fact, she terminated her employment with us much against our wishes in order to go on at that time with the preparation of the work necessary for reinstatement." Mr. Norona further testified that he would not hesitate to employ petitioner as his attorney.

In June 1943 petitioner voluntarily terminated her employment with Western Truck Lines and went to Mexico City to enter the University of Mexico. Preceding this trip, she had attempted to enlist in the armed services but failed despite her pardon because of her continued disbarment. She returned to California in October 1943 to care for her daughter when the latter gave premature birth to a child and her husband was drafted. While in Mexico petitioner received an offer to do nonlegal work at a salary of over $1,200 a month, which she rejected "because she wanted to return to her profession." From November 1943 to June 1944 petitioner was employed by Food Machinery Corporation, where she was under the immediate supervision of Thomas Bennett. Counsel for petitioner and the examiner for The State Bar stipulated that Mr. Bennett would testify that petitioner was promoted from invoice auditor to supervisory work, largely because of her ability to command work from others; that she handled no money but that her record during this employment indicated that she was rehabilitated; that he had no reason to question her honesty and integrity; and that in his opinion she was a person of good moral character.

Petitioner attended a bar examination quiz course given by William E. Burby from June to September 1944. She also attended a quiz course given by B. E. Witkin, after moving with her family to Millbrae, California, in September 1944. From October 16, 1944, to and including the time of these proceedings she has been employed at San Francisco by Neon Maintenance Corporation. Ralph V. Shelton, the owner of this business, who was her immediate employer, trav-

eled to Los Angeles to testify in petitioner's favor at his own insistence and expense. Mr. Shelton testified that petitioner has been promoted from clerk at $40 a week to manager and purchasing agent at $75 a week; that petitioner informed him of her past difficulties when she had been employed for a month trial period, and that he gave her permanent employment despite this information; that one of her positions during her employment involved the handling of funds; that together with the bookkeeper she handled at one time thirty to forty thousand dollars a month; that she could have walked off with "any amount" of money at any time if she were so inclined; that he had no occasion to question any of her work; that she was "a person of excellent moral character" and has shown sympathy and a willingness to assist with respect to personal problems of her fellow employees; that she had done an excellent job as purchasing agent, was "very conscientious" about her employment, and was able to find materials for the plant when competitors could obtain none; that he had a high regard for her for the additional reason that she was able on a small salary to support four dependents while her son-in-law was in the service. Mr. Shelton further testified that his company intended to retain her as counsel if she is reinstated, and had not previously employed her in this capacity only because she was not a member of the bar. Petitioner testified that Mr. Shelton had made a "very marvelous offer" that she intended to accept if reinstated.

Mr. Justice Thomas P. White, who wrote the decision on appeal affirming petitioner's conviction (*People* v. *Gilbert, supra,* 26 Cal.App.2d 1), has known petitioner for a number of years. Justice White testified that he wrote to the Advisory Pardon Board in petitioner's behalf; that her attitude was not one of bitterness, but that she only wanted a chance to start anew; and that it was his opinion that petitioner was a person of good moral character.

Judge Walter S. Gates of the Los Angeles Superior Court presided at petitioner's divorce proceedings and has known petitioner for about 10 years. Judge Gates testified that on the basis of his personal observation and the observations of others with whom he had discussed the matter, petitioner has "entirely rehabilitated herself" and "is a very different woman." He testified that she "absolutely" is a person of good moral character, and that the basis for this opinion in

part is "Her whole conduct; her attitude toward her family, her industry . . . I have never known her to shirk a responsibility; people feel that that she is a person of high moral character. It seems to be the consensus of opinion of people with whom I have talked. Her whole life is tied up in her children, her family, and what she could do for other people. Her idea is to get back into practice, to be of service where she can help, not to make money but to serve humanity." Judge Gates further testified that if the occasion ever arose he would not hesitate to employ her as his attorney.

Mark F. Jones, who represented petitioner in her criminal prosecution and in the pardon proceedings, has been in touch with her on a number of occasions since her release from prison. Mr. Jones testified that petitioner was a person of good moral character and a "fast and prodigious worker"; that she was skilled in the law and would be welcome "without hesitancy" in his office.

Bishop Moore, also a Los Angeles attorney, has known petitioner since about 1936, and also assisted in obtaining her pardon. Mr. Moore has been in touch with her "many times" since her release from prison on occasions when petitioner sought "friendly advice" from him. He testified that petitioner had no bitterness over her criminal conviction; that she was a person of good moral character; and that she was efficient, able, and manifested a good knowledge of the law.

Agnes Underwood, a newspaper reporter for a Los Angeles paper, has known petitioner for about 15 years, and became intimately acquainted with her after her release from prison. Mrs. Underwood testified that petitioner was a "different person" after her divorce from Gilbert; that she would not hesitate to engage petitioner as counsel; and that petitioner was "a person . . . of fine moral character, a fine, true and loyal friend, a person you would be proud to know."

May Rose Starr, an undenominational minister, was intimately acquainted with petitioner, and on the basis of petitioner's conduct both at Tehachapi, where the witness conducted services, and after parole, Mrs. Starr testified that petitioner was a person of good moral character. The witness further testified that if she needed legal advice petitioner "would be the first person I would go to."

Petitioner testified at considerable length and was subjected to careful cross-examination by the examiner for The State

Bar. She testified, in addition to matters heretofore related, that she was 43 years of age; that she had no bitterness towards the persons involved in her criminal prosecution and disbarment, and that she had determined to share her home with Mrs. E. Davis, whose property was chiefly concerned in the transactions leading to petitioner's conviction, and who has since become destitute.

Counsel for petitioner and the examiner for The State Bar stipulated that petitioner did not profit by the transactions leading to her conviction; that all the property therein concerned was accounted for; and that therefore no problem of restitution is presented.

The financial obligations of petitioner are small. The greatest is $7,300 owed on the purchase price of her home in Millbrae. A letter from W. T. Bivins, superintendent of Motive Power and Lines of the San Francisco Municipal Railway regarding his experience with petitioner with respect to this indebtedness was introduced. The record also contains a letter in petitioner's behalf from E. M. Moore, manager of the Millbrae Branch of Bank of America.

On the basis of the evidence before it, the special committee unanimously made findings favorable to petitioner, and concluded "(a) That petitioner has rehabilitated herself since her disbarment; (b) That petitioner is now a person of good moral character and integrity; and (c) That petitioner's present ability and learning in the law is sufficient to warrant her reinstatement as a member of the State Bar without being required to take an examination." On the basis of these findings and conclusions the committee unanimously recommended petitioner's reinstatement. Wixon Stevens, who was present at the hearing before the committee in behalf of the Los Angeles Bar Association, also submitted a statement to the Board of Governors approving the committee's action.

At the subsequent hearing before the Board of Governors, Alfred E. Cate, the examiner for The State Bar, stated that although at first he had been prejudiced against petitioner because of her husband's activities, on the basis of the evidence before the special committee, he recommended that petitioner be reinstated. The Board of Governors, however, by a vote of seven to six, rejected a resolution that petitioner's reinstatement be recommended to this court. The board's action was based solely on the record before the special committee.

"That this court has the inherent power and authority to admit an applicant to practice law in this state or to reinstate an applicant previously disbarred despite an unfavorable report upon such application by the Board of Bar Governors of the State Bar, we think is now well settled in this state. (*Brydonjack* v. *State Bar,* 208 Cal. 439, 446 [281 P. 1018, 66 A.L.R. 1507] ; *Vaughan* v. *State Bar,* 208 Cal. 740 [284 P. 909].) The recommendation of the Board of Bar Governors is advisory only but as that body has been provided by legislative enactment as an arm of this court for the purpose of assisting in matters of admission and discipline, the greatest deference should be, and always has been, accorded to its recommendation by this court. Nevertheless, the final determination in all these matters rests with this court, and its powers in that regard are plenary and its judgment conclusive. (*Fish* v. *State Bar,* 214 Cal. 215, 225 [4 P.2d 937] ; *Brydonjack* v. *State Bar, supra.*)" (*In re Lacey,* 11 Cal.2d 699, 701 [81 P.2d 935].)  ▪  Although the burden of proof on one seeking reinstatement cannot be overcome except by a very strong showing of rehabilitation (*Kepler* v. *State Bar,* 216 Cal. 52, 55 [13 P.2d 509] ; *In re Morganstern,* 85 Cal.App. 113, 117 [259 P. 90] ; see *In re Cate,* 60 Cal.App. 279, 286 [212 P. 694] ; *Vaughan* v. *State Bar,* 208 Cal. 740, 743 [284 P. 909] ; *Wettlin* v. *State Bar,* 24 Cal.2d 862, 869 [151 P.2d 255]), in the present case the evidence before the special committee substantiates overwhelmingly and without conflict its finding that "petitioner has gained the confidence of those with whom she has worked and among whom she has lived, and is now a person of good moral character and integrity, and has fully rehabilitated herself. She has the respect and confidence of many former acquaintances and has gained the respect and confidence of new friends and associates, both in business and out of business." The record reveals convincingly that in employment in which she engaged, petitioner not only showed diligence and efficiency, but also gained the admiration and respect of her associates. Her forthright testimony before the committee under careful cross-examination strongly indicates that this confidence was not misplaced. "In reaching a fair conclusion on the question of reformation . . . the favorable testimony of acquaintances, neighbors, friends, associates and employers with reference to their observation of the daily conduct and mode of

living of an attorney who has suffered disbarment should weigh heavily in the scale of justice.'' (*In re Andreani,* 14 Cal.2d 736, 749 [97 P.2d 456].)

■ Testimony of members of the bar and bench of high repute is also entitled to careful consideration when the petitioner has been close to their observation. (*In re Burris,* 147 Cal. 370 [81 P. 1077]; *In re Treadwell,* 114 Cal. 24 [45 P. 993]; *Vaughan* v. *State Bar,* 208 Cal. 740, 743 [284 P. 909].) Such witnesses are morally bound by their oaths as attorneys at law not to recommend a disbarred attorney for reinstatement unless they are satisfied of the rehabilitation of his character. (*In re Thompson,* 37 Cal.App. 344, 349 [174 P. 86]; see Bus. & Prof. Code, § 6068(c).)

■ Respondent contends that petitioner's testimony is inconsistent in that although in her first application for reinstatement petitioner stated that she had been unjustly convicted, she testified at the present hearing that the trial was fair. There is no inconsistency presented, however, for petitioner's testimony reveals that her views were that although had all the facts been presented to the court, a conviction would have been unjust, on the basis of the facts that were presented, the conviction was not unfair.

■ Respondent points out that several witnesses testified that they did not believe petitioner guilty of the offenses leading to her disbarment, and contends that the testimony of such witnesses is not entitled to much weight on the ground that ordinarily the merits of the disbarment will not be reconsidered on application for reinstatement. (*In re Andreani,* 14 Cal.2d 736, 751 [97 P.2d 456]; see 9 Cal.Jur. Supp. 474.) The record reveals, however, that irrespective of the beliefs of these witnesses as to petitioner's guilt, they believe her now to be a person of good moral character on the basis also of her exemplary conduct since her disbarment.

It is therefore ordered that petitioner be reinstated as a member of The State Bar of California upon payment of the fees and taking the oath required by law.

Schauer, J., did not participate herein.